THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILBERT RICE, Defendant-Appellant.

Third District   No. 75-186

Opinion filed August 6, 1976.

Robert Agostinelli and Mary Robinson, both of State Appellate Defender's Office, of Ottawa, for appellant.

Martin Rudman, State's Attorney, of Joliet (Rodney Lechwar, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant Wilbert Rice appeals from a judgment of the Circuit Court of Will County following a jury verdict finding him guilty of the murder of John Goldsmith. Rice was sentenced to a minimum of 20 years and a maximum of 40 years in the penitentiary. Defendant asserts that there are a number of trial errors which require reversal including rulings of the trial court, comments by the prosecutor, and instructions to the jury. He also challenges the imposition of the minimum term of 20 years as excessive.

From the record in the case it appears that Goldsmith's death occurred in the early morning hours of January 26, 1974, in Joliet. Police officers testified that around 1:30 a.m. they stopped Rice who was driving the

wrong way on a one-way street and found that his driver's license had been revoked. They took him to the station and booked him, and then called a cab to take him to his home in the 1300 block of Cutter Avenue.

George Parkhurst, dispatcher for the Yellow Cab Company, testified that he received a request for a cab from the police at about 2:15 a.m. and dispatched driver Goldsmith in cab 78 to the station. Parkhurst said that "a little later" he heard Goldsmith's voice calling "10-50" over the radio. Parkhurst explained that this was a code meaning "robbery." Night manager Claude Pruitt testified that he immediately called police at Parkhurst's request. He recalled that the "10-50" call came in around 2:25 or 2:30 a.m., although he admitted that his watch did not keep time accurately.

At about 2:30 a.m. three squad cars arrived in front of Rice's home to find Rice standing in the street holding a pistol, which later proved to be fully loaded. Rice dropped the gun at the officers' request and was fully cooperative thereafter. The cab was run over the curb into a hedge at an angle, and Goldsmith was dead behind the steering wheel with four bullet wounds in his body.

Investigation showed that the right front window of the cab was open and there were no bullet holes in the car. A black purse with a plastic toy revolver was found on the floor at the driver's right. Goldsmith's clipboard showed $37.40 in fares logged, while a total of $43.59 was found in the cab or on Goldsmith's body.

Mrs. Rice and the Burtons (her sister and brother-in-law) were at the scene. Officer Snyder escorted the hysterical wife of the defendant up to the house. In the kitchen he noticed some ammunition casings, and through the door of an adjacent bedroom he noticed an open gun box, which proved to contain some ammunition. This evidence was taken by the officer.

At the station Rice was not given a breathalyzer test because he would not sign a *Miranda* rights form. A blood sample was, however, taken at 7 a.m. and showed a blood alcohol reading of .138%. In addition, police testimony indicated that Rice had been drinking when he was originally picked up before the shooting.

At a 5:30 a.m. interview with Detective Hernandez, defendant said he did not remember shooting anyone; he did recall leaving the police station in a cab and later going into his house, after which there was some shooting. Shortly after noon he told Hernandez and Detective Baum that if he had been standing in the street with a loaded gun, he must have obtained it from his bedroom where he kept it and then loaded it, since he never kept the gun loaded in the house. He finally said that he "must have shot the dude" if what the detectives told him was true, but had no idea why he would have done so. Even later he told the detectives that he

recalled going in the house, loading the gun, and telling his wife he was going outside to commit suicide.

Defendant later, at trial, testified that he got off work about 3:10 p.m. on January 25, 1974; that he went home and loaded his gun, and took it along for protection when he and his sister went to the bank to cash some checks, one for $500. He said he worked on his taxes that evening until after 8 p.m., when he and some friends went out for a few drinks. By some time after midnight, he said, he had spent $27 drinking scotch and water, and he left for home, at which time he was first apprehended by the police.

He recalled telling Goldsmith, in the cab on the way home from the station, that he would not pay the fare and that Goldsmith should collect from the police. Rice said that Goldsmith responded by waving a gun, which he put back into a black "holster" of some sort which defendant noticed by glancing over into the front seat. He said that when he got out of the cab and still refused to pay, Goldsmith reached for the "holster." Rice said he could not remember what happened then, until the police arrived. A pathologist testified that the wounds received by the deceased were consistent with his being in a reaching position when he was shot.

Defendant also testified that after graduating from high school he had volunteered for two tours of duty in Vietnam, during which he was decorated several times. He had steady employment since then and was buying his own home. Four character witnesses also testified on behalf of defendant. Rice further described "blackouts" that he experienced while in the service. He said that he would return from missions with little or no recall of what had happened, the severity of the memory loss being directly proportionate to the severity of the fighting and number of casualties. He said he often had similar blackouts following heavy drinking episodes.

A forensic pathologist, Dr. Levine, testified for the defense that with the 7 a.m. blood sample of .138% indicated, that defendant would have had a blood alcohol reading of between .20 and .30% around 2:30 a.m., and would thus have been quite intoxicated at the time. The defendant offered Dr. Levine's further testimony that a person with such a level of alcohol in the bloodstream would have at least a partial loss of memory, but the trial court excluded such testimony on the ground that it was within the common knowledge of the average lay juror.

The theory of the State was that when Rice arrived home he went in the house ostensibly to get some money for his fare, loaded his pistol inside, and came back out to shoot Goldsmith. The defendant's version was that he rode in the cab still carrying his pistol from the trip to the bank, and shot Goldsmith in self-defense when the cabbie pulled what later proved to be a toy gun on him. Rice attempted to explain his original failure to recall what happened, and his subsequent partial memory of going into

the house and getting his gun, by his past history of mental blackouts and the likely effect of the alcohol he had consumed.

The first issue, and the strongest attack on the action of the trial court, is based on the assertion of defendant that the trial court committed reversible error in prohibiting all expert testimony concerning the physiological manner in which ingested alcohol affects the human memory and judgment. Defendant emphasizes the exclusion of Dr. Levine's testimony on the effect of alcohol on the human memory. This pathologist would have testified that 75 to 80 percent of all persons with blood alcohol levels between .210% and .246% (as he estimated defendant had at the time of the shooting), would have no memory of what occurred while such persons were so intoxicated. The remaining 20 to 25 percent would have only partial recovery of memory concerning that period. Defendant's position is that he sought the testimony to support the credibility of his own testimony, which was to the effect that he at first remembered little or nothing of the incident, and then gradually recalled parts, such as seeing the cab driver reaching for the gun.

■■ The State contends that the expert testimony regarding the effects of alcohol on the mind should not be admitted in this case where its value is only to help defendant's credibility by indicating the likelihood of the truth of his story. No authority for such a proposition limiting the use of expert testimony to so-called "direct" issues as opposed to the issue of credibility has been called to our attention, nor have we discovered any. The issue of credibility itself is an important and sometimes decisive issue to be determined by the jury as trier of fact.

Expert testimony has generally been admissible "when the subject matter of the inquiry is of such character that only persons of skill and experience in it are capable of forming a correct judgment as to any facts connected therewith." (*People v. Stapelton* (3d Dist. 1972), 4 Ill. App. 3d 477, 480, 281 N.E.2d 76; *Mahlstedt v. Ideal Lighting Co.* (1915), 271 Ill. 154, 171.) In *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516, 211 N.E.2d 733, the court said:

"[T]he trend is to permit expert testimony in matters which are complicated and outside the knowledge or understanding of the average person, and even as to matters of common knowledge and understanding where difficult of comprehension and explanation."

See also *Carlson v. Hudson* (3d Dist. 1974), 19 Ill. App. 3d 576, 578, 312 N.E.2d 19; *Weaver v. Lovell* (4th Dist. 1970), 128 Ill. App. 2d 338, 344-48, 262 N.E.2d 113.

■■ While it is true that it may be common knowledge that the consumption of sufficient quantities of alcohol can impair a person's memory concerning what occurred while he was intoxicated, there is a

serious question as to whether laymen would necessarily know that a person as intoxicated as defendant was, would have, to a reasonable medical certainty, at least a partial loss of memory and the probability of a delayed partial recall, as noted by Dr. Levine. The rates of absorption and oxidation of alcohol, into and out of the bloodstream, and the effects of alcohol on the body, have generally been considered proper subjects for expert testimony. *Craft v. Acord* (4th Dist. 1974), 20 Ill. App. 3d 231, 236, 313 N.E.2d 515; *Weaver v. Lovell* (4th Dist. 1970), 128 Ill. App. 2d 338, 344-48, 262 N.E.2d 113; *Schneider v. Kirk* (2d Dist. 1967), 83 Ill. App. 2d 170, 180, 226 N.E.2d 655.

It is obvious to us from the record in this case that the expert testimony of Dr. Levine would have been helpful to the jury in its evaluation of the possibility that defendant suffered some sort of memory loss, commonly called retrograde amnesia. The testimony was relevant, since defendant had asserted he could not remember much of the shooting and the jury may have had considerable doubt as to his credibility without having some expert testimony on this issue. We conclude that we can find no justification for the exclusion of such evidence under the facts in this case. Under the facts as shown by the record, we believe the trial court committed reversible error in excluding Dr. Levine's testimony on this issue.

We have referred to the fact that other objections were made by defendant as to comments of the prosecutor in final argument and relating to instructions to the jury. We do not believe it is valuable to review such contentions in this cause in view of our disposition of the case and remandment to the trial court. We conclude that it is unlikely that similar comments will be made by the prosecutor on retrial or that there would be any reversible error in trial court rulings or instructions in this cause. The failure to permit the testimony of Dr. Levine, as we have indicated, constitutes reversible error and this cause is, accordingly, reversed and remanded to the Circuit Court of Will County for a new trial.

Reversed and remanded.

BARRY and STENGEL, JJ., concur.