THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES STEVEN KESTER, Defendant-Appellant.

Third District    No. 78-335

Opinion filed November 27, 1979.—Rehearing denied December 17, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, and Theodore A. Gottfried, of State Appellate Defender's Office, of Springfield, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin, Martin N. Ashley, and Thomas R. Lamont, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from a judgment of conviction for aggravated kidnapping and unlawful restraint entered by the circuit court of Peoria County after jury trial.

Late in December 1977, Vida Pope and Cheryl Oliver were arrested for burglary and theft. While in custody they were questioned about a home invasion which had occurred late in November 1977. Both women admitted participation and said that the defendant, James Steven Kester, had done the planning.

On February 8, 1978, Vida Pope and Cheryl Oliver pleaded guilty to burglary and theft. Each was given a sentence of two to six years on each charge, all sentences to run concurrently. In return for testimony in the instant case each was to receive an additional sentence of two to six years to run concurrently with the previous sentences with credit for time served on those sentences.

On February 7, 1978, defendant was indicted on two counts of aggravated kidnapping and two counts of unlawful restraint.

At the trial Vida Pope testified that on Thanksgiving Day, November 24, 1977, she, Cheryl Oliver, and the defendant met at a grocery store. They had not seen one another since September when both women had left the drug rehabilitation program at Stonehedge Center in Peoria where defendant had been working as a counselor. At the time of the meeting defendant was working at the Danvers Packing Plant in Danvers, Illinois. He talked to Pope about helping her to get a job there.

On Friday, November 25, 1977, defendant went to the apartment where Pope and Oliver were living. They talked further about possible employment. Later that day Pope and the defendant went to the Danvers plant for defendant's paycheck. They could not get it, however, because only a warehouse employee was there and he could not disburse checks. Defendant and Pope returned to Peoria and agreed to meet the next day to work on defendant's car.

On Saturday, November 26, 1977, defendant again went to Pope's apartment. Defendant and Pope then went back to his house so that he could change his clothes before working on the car. While he was changing the defendant told Pope he had a way to get a lot of money with little chance of getting caught. He had worked at an Eagle store and knew how grocery stores were operated. A Brink's truck arrived at the Eagle store every Wednesday. Receipts by that time were between $30,000 and $50,000. The plan was to learn the name of a grocery store manager and then go to his house, hold his family hostage, and demand money for their safety.

Defendant and Pope then returned to Pope's apartment so that she could change clothes. While Pope was changing defendant told Oliver his plan.

Defendant and Pope drove to the garage where they planned to work on the car but it was closed, so instead they drove past the Eagle store in Madison Park and discussed the plan. Pope went into the store

and pretended to apply for a job. She was told the manager's name but she could not find it in the telephone book. Since they could not find out where the manager lived, the defendant and Pope drove to the Kroger store in Madison Park. The manager of that store lived in a trailer park and the parties decided that trailers were too close together for them to avoid detection during the home invasion phase of their plan.

On Monday, November 28, 1977, Pope and the defendant went to the Kroger store on Wisconsin Street in Peoria where they learned the manager was Boyd Kilpatrick. Later that day they drove to Danvers, Illinois, and talked to the manager about defendant's pay and a job for Pope.

On Tuesday, November 29, 1977, Pope, the defendant, and Oliver went to the Kroger store on Wisconsin Street to look at Kilpatrick and decide if he were the type who would pay ransom to save his family and they agreed he was their man. When they could not find Kilpatrick's name in the telephone book, and knowing the cab company had a city directory, they called the Yellow Checker Cab Co. and learned Kilpatrick's home address. Pope and Oliver then drove to the Kilpatrick home. They saw a "For Sale" sign in front of the house. After returning to their home Pope called the realtor and found that the house was for sale and that the Kilpatricks had three children.

Plans were finalized and on November 29, 1977, Pope and Oliver were to enter the Kilpatrick house and hold the family hostage. Defendant was to keep watch on the Kroger store and pick up the ransom money. Originally he was to wait in the Kroger parking lot but the plan was changed so that he was to wait in a telephone booth at the intersection of Nebraska and Wisconsin.

During the home invasion Pope wore a blue coat and a ski mask. She had gotten the coat from the defendant shortly before the occurrence. Oliver wore a ski mask and a scarf. Pope and Oliver gained entry by showing a gun. They told Mrs. Kilpatrick to telephone her husband at the Kroger store. She told her husband not to be upset but some people were in the house with a gun. She then gave the telephone to Pope who read instructions written by the defendant on a yellow sheet of paper. Kilpatrick was told that someone was watching him; he was to take the money from the safe, put it in a bag, and leave it next to a light pole in the parking lot. Then he was to go to the telephone booth at Nebraska and Wisconsin and he had 10 minutes in which to do all that. After the telephone call Pope and Oliver tied up Mrs. Kilpatrick, cut the cords on both telephones, went through her purse and took some costume jewelry and some money.

Pope and Oliver left the Kilpatrick house and drove past Nebraska and Wisconsin where they found the defendant waiting. They realized

there had been a misunderstanding. Defendant drove to the Kroger store to see if the money had been dropped and found that it was not there.

Later that night defendant saw a newscast which said Kilpatrick had misinterpreted the instructions. In any event, no money was in the bag which was dropped.

At trial Pope testified that the items taken from the Kilpatrick residence were destroyed or thrown away. The yellow paper was burned; the blue coat should have been burned but was not. Oliver's testimony was similar to Pope's testimony.

Several witnesses who testified for both the State and the defendant corroborated many details of the State's case.

The defendant testified and denied participation. His mother, stepfather and stepsister testified that he was at their home looking at pictures when the offense occurred.

Defendant sought to introduce testimony by Dr. Perry Davis, a psychologist and hypnotist, who had hypnotized defendant's mother, Edna Roten, however, the trial court ruled that his testimony was inadmissible. Defendant then made an offer of proof that if Davis were permitted to testify he would state that he hypnotized Roten by using a counting method. In that manner he enables an individual to recall a situation or date by asking him to recall incidents. In Davis' opinion this is effective and accurate. Reliability is dependent upon the depth of hypnosis and Roten goes into a trance in the deepest degree. Davis had hypnotized Roten many times and was familiar with her depth of trance.

While in the trance Roten recalled that the defendant arrived at her home at 7 p.m. on November 29, 1977, and remained there until 9:30 p.m.

Davis would testify that Roten was telling the truth and that he did not suggest to her what her testimony should be. In addition Davis would testify as to what Roten told him while she was in the trance.

The trial court refused to admit the testimony on grounds of doubtful reliability, hearsay, and invasion of the province of the jury who determines the credibility of the witnesses.

The defendant was convicted of kidnapping and unlawful restraint and was sentenced to serve not less than four nor more than 12 years imprisonment.

On appeal defendant raises the following issues: (1) whether his conviction based on the testimony of two convicted felons who were confessed heroin addicts and who were testifying under a plea agreement was sufficient to prove defendant guilty beyond a reasonable doubt when that testimony was filled with inconsistencies; (2) whether he was deprived of a fair trial by improper prosecutor conduct in both closing argument and cross-examination of the defendant; (3) whether he was denied a fair opportunity to present his defense and thereby denied due

process of law by the trial judge's exclusion of a qualified expert witness offered to support the testimony of alibi witnesses; (4) whether he was deprived of a fair trial by the trial judge's statement to the jury that a prosecution witness entered a plea agreement in exchange for her truthful testimony.

Defendant argues that the testimony of Vida Pope and Cheryl Oliver was insufficient to convict him because they were confessed accomplices in the kidnapping; they were testifying under a plea agreement with the State; they were both heroin addicts at the time of the crime; they each had a record of prior felony convictions; their testimony contained numerous inconsistencies of material fact.

■■ All of defendant's complaints concern matters which affect the credibility of the witnesses. In Illinois, the jury or the trial court sitting without a jury determines the credibility of the witnesses. (*People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96; *People v. Marshall* (1975), 26 Ill. App. 3d 905, 326 N.E.2d 246.) Accomplice participation (*People v. Mullins* (1963), 28 Ill. 2d 412, 192 N.E.2d 840), narcotics addiction (*People v. Johnson* (1967), 87 Ill. App. 2d 390, 231 N.E.2d 647), plea negotiations (*People v. West* (1977), 54 Ill. App. 3d 903, 370 N.E.2d 265), and prior felony convictions (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143) are all matters which affect the credibility of witnesses and the weight to be given their testimony. The jury in the instant case was fully instructed on the issue of credibility. We must therefore assume that they found the testimony of Pope and Oliver was credible.

■■ Defendant argues that there were numerous inconsistencies of material fact in their testimony. Pope and Oliver disagreed on the dates of the November meetings with defendant. Oliver testified the meetings occurred a day earlier than Pope testified the meetings occurred. We believe this inconsistency was meaningless. Pope and Oliver also disagreed about details of the instructions given to Boyd Kilpatrick. This testimony was also inconsistent with the testimony of Boyd and Sheila Kilpatrick, however, it was explained in Pope's testimony and in Oliver's testimony that they disagreed about the instructions before they went to the Kilpatrick home. They also disagreed about where defendant would be and what he would be doing.

We do not find these inconsistencies material. We find that the testimony of Pope and Oliver is basically consistent. Defense counsel in his closing argument agreed that the testimony was basically consistent. We cannot rule that evidence is insufficient for conviction merely because it consists of bizarre incidents related by less than respectable citizens. We must determine whether a jury could reasonably believe the testimony was truthful beyond a reasonable doubt.

The testimony of Pope and Oliver was basically corroborated by that

of Kilpatrick; by the blue coat given Pope by Kester; by the testimony of Kenneth Israel, the warehouseman at Danvers Packing Plant; by Mr. Radamaker, the manager at Danvers; in part by the testimony of defendant; and in part by the testimony of defendant's wife. Considering the corroboration, we believe the jury could find the testimony truthful.

Defendant also argues that he was denied a fair trial by the improper conduct of the prosecutor. While cross-examining the defendant the prosecutor twice asked him if he had been discharged from his employment as a counselor at the Stonehedge Center. Defendant first answered that he left because he was dissatisfied with his job. The second time he answered that it was a mutual decision between his supervisor and himself. Generally it is error to lay a foundation for impeachment and not substantiate the implications made while laying the foundation. (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161.) When, however, any negative implication is unrebutted by an equivocal answer, it is not necessary to introduce substantiating evidence. (*Sesemann v. Ellington* (1977), 51 Ill. App. 3d 790, 367 N.E.2d 219.) Since defendant's second answer was different than his first, we find no error.

Defendant also complains that the prosecutor stated during closing argument that the alibi witnesses had "concocked [*sic*]" their testimony; had told the jury why his office had entered into a plea agreement with Pope and Oliver; falsely told the jury that no one had been informed of defendant's alibi prior to the time that it was introduced at trial; falsely told the jury that defendant's wife's testimony corroborated the State's case; and falsely told the jury that defendant was in custody for six months prior to the trial.

Prosecutorial misconduct is a matter of grave concern since the prosecutor speaks with the authority of the State of Illinois. He must take great care that he does not prejudice the defendant to the extent that he affects the jury verdict. (*People v. Fain* (1976), 41 Ill. App. 3d 872, 355 N.E.2d 61.) This does not mean, however, that he cannot be zealous. The nature of closing arguments requires that each be carefully scrutinized to determine whether the defendant were prejudiced and if he were, to what extent.

■■ Defendant complains that the prosecutor accused the alibi witnesses of concocting a defense and of failing to tell anyone of the alibi defense until the time of trial. After objection this was changed to failing to tell a police agency. The prosecutor may comment upon the credibility of the witnesses. He may also characterize the testimony if he relies on the evidence and inferences to be drawn from the evidence. (*People v. Sinclair* (1963), 27 Ill. 2d 505, 190 N.E.2d 298; *People v. Count* (1969), 106 Ill. App. 2d 258, 246 N.E.2d 91.) Further, a prosecutor may argue the inconsistency between the testimony and the conduct of an alibi witness

who had the opportunity to make a statement on behalf of the defendant at the time of his arrest but did not. *People v. McMath* (1968), 104 Ill. App. 2d 302, 244 N.E.2d 330, *aff'd* (1970), 45 Ill. 2d 33, 256 N.E.2d 835, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92.

■■ In the instant case the defendant's mother, stepfather, and stepsister made no protest to any police agency that the defendant had an alibi for the night of November 29, 1977, even though he spent six weeks in jail charged with crimes alleged to have been committed that night, yet at trial they were sure that he was with them looking at pictures. We believe that the prosecutor could properly present this argument.

Defendant cross-examined Pope and Oliver regarding their plea negotiations with the State. He now complains that the prosecution explained the plea negotiations to the jury during closing argument. When a defendant raises an issue he cannot complain because the State pursues it. *People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190.

During cross-examination the prosecutor told the jury that defendant's wife had corroborated testimony given by witnesses for the State. Defendant's wife did testify that defendant gave Pope a coat but that she could not remember if he gave it to her on November 29, 1977, or the next day. She was sure that Pope and the defendant worked on defendant's car the day Pope was given the coat. During argument the prosecutor said Tuesday rather than November 29, 1977. He also admitted that she gave only partial corroboration. There was an objection by defendant and the court ruled that the jury had heard the evidence and could decide what the testimony had been. The prosecutor then made a corrected statement. We believe that any error here was harmless and was corrected by the objection, the court's ruling, and the prosecutor's subsequent statement.

We believe that the same is true of the statement that defendant was in custody for six months. Defendant testified "* * * I had been incarcerated for a period of time, at least six weeks." There was an objection and the trial court said there was no evidence as to where defendant was and that it was six weeks, not six months.

Next defendant argues that he was denied a fair opportunity to present his defense. The trial court refused to allow defendant to call Dr. Perry Davis as an expert witness. Davis had hypnotized defendant's mother to enable her to recall the events of the night of November 29, 1977.

■ We do not believe that the trial court erred in ruling Davis' testimony was inadmissible. First, at the time of trial, testimony of a hypnotist had not yet been declared admissible in Illinois. Second, even though the Fourth District subsequently ruled that such testimony is admissible, the testimony proffered by the defendant included hearsay which would

have been inadmissible under any circumstances. Third, there was some discussion of unreliability, but nothing to show the reliability of hypnosis.

On January 30, 1979, the Fourth District filed their opinion in *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848, *appeal denied* (1979), 75 Ill. 2d 593. That opinion has an excellent discussion of the law in several jurisdictions, including Illinois, prior to January 30, 1979.

The prosecution in *Smrekar* offered into evidence testimony of an identification witness who had undergone hypnosis prior to her identification of him. The prosecution did not offer into evidence testimony of what the witness had told the hypnotist. Therefore, the only issue was whether the hypnotist had tainted the identification of the defendant which the witness later made so that her subsequent in-court identification of the defendant was inadmissible. The defendant in the instant case sought to support the credibility of his witness and introduce testimony of what the witness said during hypnosis.

■■ We agree with the Fourth District that any testimony from the hypnotist of what a witness said to him during hypnosis is hearsay and inadmissible. Thus, a part of the testimony which defendant sought to introduce would be inadmissible regardless of our ruling.

We do not agree with the trial court that the testimony of the hypnotist that the witness was telling the truth would invade the province of the jury. We have already determined that expert testimony in support of a witness' credibility is admissible. (*People v. Rice* (1976), 40 Ill. App. 3d 667, 352 N.E.2d 452.) This does not mean that expert testimony is conclusive; it is merely one more factor for the jury to consider in determining credibility.

Based on the record in the instant case, we do not believe that the trial court could have found the testimony of the hypnotist would be reliable. The record shows that Davis' mentor, Dr. Eric Erickson, has stated that subjects do lie under hypnosis and this was unrebutted. Under the circumstances we cannot rule that the trial court was in error.

Lastly, defendant argues that he was deprived of a fair trial by the judge's statement that a prosecution witness entered into a plea agreement in return for truthful testimony. Defendant argues that this invades the province of the jury and lends the prestige of the trial court in support of the credibility of the witness. Ordinarily we might agree with the defendant; however, in the instant case he asked a question involving the plea agreement in order to attack Oliver's credibility. She did not know the details of the agreement. The court, out of the presence of the jury and in conference with the attorneys, asked if he should say truthful testimony, and there was no objection to such word usage.

■■ When there is no objection we will find that the issue is waived unless conduct of the judge is so extreme that fair trial is impossible. Throughout

his brief defendant has cited cases in which prosecutorial and judicial misconduct was extreme. We do not believe that those cases are persuasive here.

For reasons stated above, the judgment of the circuit court of Peoria County is hereby affirmed.

Affirmed.

STOUDER, P. J., and STENGEL, J., concur.