# STATE OF MARYLAND *v.* LEON COLLINS

[No. 105, September Term, 1982.]

*Decided September 8, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Richard B. Rosenblatt* and *William C. Rogers, III, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Arthur A. DeLano, Jr.,* and *Isaac S. Kershner, Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., concurs in part and dissents in part, and filed a concurring and dissenting opinion at page 703 *infra.*

In this case we face for the first time the issue of testimony by a witness after hypnosis. This is one of five cases currently pending before us involving that issue. We shall affirm the judgment of the Court of Special Appeals in *Collins v. State,* 52 Md. App. 186, 447 A.2d 1272 (1982), although not, insofar as the issue of hypnosis is concerned, for the reasons stated by that court.

Leon Collins was convicted of the first degree murder of his wife by a jury in the Circuit Court for Worcester County. The Court of Special Appeals vacated that judgment on the basis of error relative to the hypnotically enhanced testimony and remanded the case for a new trial. The State petitioned us for a writ of certiorari. Collins filed a conditional cross-petition. We granted both petitions.

The State claims:

> The testimony of the witness Davis was properly admitted by the trial court despite the fact that his testimony was hypnotically refreshed where there was only minor variation between the pre and post-hypnotic testimony and where sufficient safeguards were employed to ensure that the

post-hypnotic testimony was not the product of suggestiveness.

Collins contends:

1 — The trial court erred in denying his motion to suppress his statements to the police where the statements were involuntary and were not made pursuant to a valid waiver of the privilege against self-incrimination and the right to counsel.

2 — There was error in denying his motion to suppress extra-judicial statements obtained during an unreasonable delay in presenting appellee before a judicial officer in violation of Maryland District Rule 723 a.

These, of course, are in addition to his claim that the hypnotically enhanced testimony was improperly admitted.

I

The facts relative to the points raised by Collins are set forth in the opinion by Judge Liss for the Court of Special Appeals. We shall set forth only such brief facts as are necessary to a clear understanding of our decision relative to hypnosis.

Shortly after midnight on July 16, 1980, a State trooper was advised that Alfred Davis had reported that Olivia Collins had been shot by her husband at a truck stop on Rt. 13, south of Pocomoke City in Worcester County. Her whereabouts were then unknown but Davis said that she was alive and bleeding before she was taken from the scene. Collins was the first individual whom the police approached. He was taken to the scene of the shooting for a showup with Davis. Davis was unable to identify him. The body of Mrs. Collins ultimately was recovered from her car in the Pocomoke River near a boat ramp. Collins was charged with murder.

At the first trial the jury was unable to agree. At that trial Davis testified that he was not in the victim's car at the time of the shooting. Between that trial and the second trial Davis was hypnotized by Dr. Edmond T. Delaney, a professor of psychology at Salisbury State College. The session was tape recorded by a special investigator with the office of the State's Attorney for Worcester County. He was present during the entire session.

On the motion to suppress the hypnotically enhanced testimony the State called as an expert Dr. Daniel Stern, a clinical psychologist. He was accepted by the defense as an expert. Dr. Stern has been Director of the Investigative Hypnosis Institute since 1979, Director of Psychological Service at North Charles General Hospital since 1974, and assistant professor of psychology at Loyola College since 1975. He was asked what process takes place during memory, to which he replied:

> "The old idea was that our brain was like a computer and that everything that occurs to us is somehow imprinted into the brain. And that was the theory of what happened with memory for a very, very long time. And what we found out through scientific research is that's not true at all. That's not what happens.
>
> "There are many factors which are being intermediated within the memory process that shows us that our brain is not a computer. What occurs is that first of all, sensations impinge upon us and then we, as human beings, as imperfect things, begin, because of our own motivation or because of interpretations we make on our senses, this is what structures our memory. If memory is not pure data, is not raw data, we put on, though, these sensations that we have, our own feelings, our own motivations, our own perceptions, and in that way memory is really a reconstructive type of process where once we get the raw data that comes through our senses, our smell, our taste, our sight,

and so forth, things are then put upon it, okay, and including our own perceptions, our own interpretations. And that's basically the theory of memory as it exists now. That we take in this raw data and this raw data is then changed based upon our interpretation of what's taking place within our environment. And it's called the reconstructive theory of memory."

He said, "In proving that hypnosis is not sleep, we know that hypnosis is a heightened state of awareness." He then went on to say that a second part in terms of defining hypnosis "is that hypnosis is a heightened state of relaxation." He referred to "confabulation" as "fill[ing] in the gaps in our memory." He explained:

"We tend to confabulate if there is something in our memory, if there is a block in our memory or if there is a phase in our memory. We tend to try to fill it in . . . . We try to close up and fill in the gaps, and we intend to do that by memory. All memory is confabulation. And these are the two major problems."

He said there are no different problems which affect memory under hypnosis, adding, "The same problems that affect memory out of hypnosis are the same exact problems that affect memory under hypnosis. There is no other. . . . [T]here is no scientific research to indicate that a person is more likely to confabulate in recalling memory under hypnosis than when he is out of hypnosis."

Dr. Stern saw the following as the necessary safeguards for hypnotically refreshing the memory of a witness:

1. The person performing the hypnosis should be well trained.

2. The individual conducting the hypnosis session should be independent of the case that is involved.

3. Any information given to the hypnotist should be very limited because this lessens the chances of suggestibility.

4. All contact between the hypnotist and the person hypnotized should be recorded. Videotaping it would be even better.

5. The hypnotist and the person hypnotized do not need to be the only persons in the room.

Dr. Stern specified that when he is doing hypnosis he wants the investigator in the room. He explained:

"First of all, the investigator is not to say a word, and I tell them that. If they want to ask a question or something like that, they write it down on a piece of paper for me and hand it to me and I do the asking to make sure the question that is asked is in as non-suggestive a way as possible; okay? So the investigator never says a word, but they are there, and the basic reason for that is, one, I don't think having the investigator in there will influence the session in any way, number one. Number two, I have found in my experience, and I have done about a hundred and ninety-seven forensic hypnosis cases in the last six years, that it kind of puts the person hypnotized at ease. In many cases they were being hypnotized for the first time, so there is apprehension there. The investigator, who they have seen usually on several occasions, puts them at ease a little bit. So I want them there for that.

"True, I am not an investigator. 1 am not a lawyer. I am not a law-enforcement person. I am a psychologist. I am not an interviewer in that sense. I am not so sure being a psychologist and not a police officer or an investigator exactly what information is needed. I want the investigator there to feed me notes to help me with the session. So I prefer that the investigator be there. I don't think it should be a three-ring circus and having everybody in creation there, but I do like to have the investigator there, and I think it's very proper."

He indicated his familiarity with Dr. Martin T. Orne, about whom we shall have more to say later, adding that he had testified in the same case with Dr. Orne on several occasions. He recognized that his preference for having the investigator in the room was at odds with the safeguards laid down by Dr. Orne. Dr. Orne's standards were adopted by the New Jersey court in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), which we shall discuss later.

The trial court ruled the hypnotically enhanced testimony of Davis was admissible.

As a result of the hypnosis Davis was able to recall that he was actually in the car at the time of the shooting. At the second trial he testified that a car, identified by Mrs. Collins as her husband's car, pulled up beside the car in which they were then seated. A man got out, approached the car and ordered Davis to get out of his "wife's car." An argument ensued between this man and Mrs. Collins, after which the man pulled a rifle from his car and shot her. Davis left to obtain assistance. As he returned with aid and after a telephone call had been made for the rescue squad, he saw a man get in the car and drive it away.

On cross-examination Davis admitted that he had testified at the first trial that he was fifteen feet from the car when the shooting occurred. He was asked why if he testified at the first trial that he was not in the car when the shooting occurred he would testify at the second trial that he was. His answer was:

> "I'll answer for this reason: now, I have never been under hypnosis or anything in my life, and I agreed to go to Dr. Delaney, lose a day from work and go on under hypnosis to make sure that I told the truth and nothing but, to make sure that I told everything that I knew in the right respective [sic] doubt without being anyway possible [sic] for anybody, and this is why I did it. And that hypnosis statement Dr. Delaney, during his questioning, he found out I was in the car."

Davis gave substantial detail at the second trial:

"She said, 'That looks like my husband's car.' And I said, 'Well, I'll leave.' And she said, 'No, we are just sitting here talking. No need to leave.' And by that time the car pulled up right beside hers. And she said, 'That is my husband's car.'

"And by that time a man got out and told me, said, 'Get out of this car. Get out of my wife's car.' And I said, 'Okay.' She said, 'No, he don't have to get out.' Said, 'We are not doing anything. We are just sitting here talking.' He said, 'Well, you get out.'

"So 1 started to get out, and she said, 'No, don't get out.'

"At that the person reached through the window of his car, pulled out a rifle and started shooting. Mrs. Collins fell over on me. And, evidently, the rifle must have jammed, because he was trying to uncock it somehow. And after he didn't get it unjammed, he got in his car and pulled away.

\* \* \*

"Then after the gun jammed, he put the gun back in the car and went around and got in his car and drove away. By that time I lift up Mrs. Collins and call her. By this time Mrs. Collins was laying over on me, and I picked her up in the seat and called her and she didn't say anything.

"I got out of the right side of the door and ran up to the truck stop and got Mr. Wood. I told him that Miss Olivia had been shot. And he got on the phone and called the rescue squad."

In *Collins,* 52 Md. App. 186, the Court of Special Appeals said:

"[W]e are convinced that applying the standards explicated in *Frye* [*v. United States,* 293 F. 1013 (D.

C. Cir. 1923)] for the use of hypnosis to restore or refresh the memory of a witness is not accepted as reliable by the relevant scientific community and that such testimony is therefore inadmissible. To the extent that previous cases in this jurisdiction have permitted the admissibility of hypnotically induced testimony, we hereby overrule those cases." 52 Md. App. at 205.

The court concluded the "hypnotic" portion of its opinion by saying:

"It may well be that as hypnotherapeutical techniques are refined, such techniques may become acceptable in the relevant scientific community as several other techniques have achieved such recognition. Until this occurs, however, hypnosis may be used only for investigatory purposes and under the strict guidelines as set forth in *State v. Hurd,* [86 N.J. 525, 432 A.2d 86 (1981)]." 52 Md. App. 205-06.

## II

The majority of courts which have considered hypnosis as it affects testimony of a witness have applied the test laid down in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), adopted in Maryland in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), although they may not in every instance have referred to *Frye. See State ex rel. Collins v. Superior Court, etc.,* 132 Ariz. 180, 199, 644 P.2d 1266 (1982); *State v. Mena,* 128 Ariz. 226, 231, 624 P.2d 1274 (1981); *People v. Shirley,* 31 Cal. 3d 18, 54, 641 P.2d 775, 181 Cal. Rptr. 243, 265, *cert. denied,* U.S. , 103 S. Ct. 133 (1982); *People v. Quintanar,* 659 P.2d 710, 711-12 (Colo. Ct. App. 1982); *State v. Conley,* 6 Kan. App. 2d 280, 285, 627 P.2d 1174 (1981); *Collins v. State,* 52 Md. App. at 205; *Commonwealth v. Juvenile,* 381 Mass. 727, 412 N.E.2d 339 (1980) (The court said at 412 N.E.2d 342, "We need not decide now whether the rule of the *Frye* case appropriately should be applied to test the

admissibility of hypnotically aided testimony." Nevertheless, it seems to be the *Frye* rule which it adopted. The court said at 412 N.E.2d 343, "Hypnotically aided testimony is different in character, but consideration of the *Frye* rule, or some modification of it, may nevertheless be appropriate in such a situation. Cf. *State v. Temoney,* 45 Md. App. 569, 577-578, 414 A.2d 240 (1980)."); *People v. Gonzales,* 108 Mich. App. 145, 149, 161, 310 N.W.2d 306 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn. 1980); *Hurd,* 86 N.J. 525 (The court said at 536, "We agree with the trial court below and those courts elsewhere that have held that hypnotically refreshed testimony must satisfy the standard of acceptability for scientific evidence before it is admissible in a criminal trial." It then referred to its own adoption of the *Frye* rule before stating, "This standard has previously been applied only to the results of physical tests such as radar, ... the polygraph, ... and voiceprints .... But we believe that the policy reasons embodied in the general acceptance standard are germane to hypnotically refreshed testimony as well." *Id.* The court alluded to the statement by the trial court that hypnosis had met the test imposed by *Frye* and said, "Unlike the courts in *Mena, supra,* and *Mack, supra,* the court below did not demand, as a precondition of admissibility, that hypnosis be generally accepted as a means of reviving truthful or historically accurate recall. We think this was correct." *Id.* at 537.); *People v. Hughes,* 59 N.Y.2d 523, 453 N.E.2d 484 (1983); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1981); and *Com. v. Nazarovitch,* 496 Pa. 97, 101, 436 A.2d 170 (1981). Cases which seem to have rejected *Frye* insofar as hypnosis is concerned include *Brown v. State,* 426 So. 2d 76, 89 (Fla. Dist. Ct. App. 1983), and *State v. Long,* 32 Wash. App. 732, 649 P.2d 845, 846 (1982).

Strictly speaking the evidence here is not of the type with which *Frye* is normally concerned in such techniques as spectrographic analysis and polygraph. In *Reed* Judge Eldridge catalogued a number of techniques to which *Frye* had been applied:

"The *Frye* test has been invoked by courts in their consideration of, *inter alia,* paraffin test, *Brooke v. People,* [139 Colo. 388, 339 P.2d 993 (1959)]; medical testimony regarding the cause of birth defects, *Puhl v. Milwaukee Automobile Ins. Co.,* [8 Wis. 2d 343, 99 N.W.2d 163 (1959)]; breath analysis devices designed to test for intoxication, *People v. Morse,* [325 Mich. 270, 38 N.W.2d 322 (1949)]; truth serum injections, *State v. Linn,* [93 Idaho 430, 462 P.2d 729 (1969)]; blood tests, *People v. Alston,* [79 Misc.2d 1077, 362 N.Y.S.2d 356 (1974)]; neutron activation analysis, *State v. Stout,* [478 S.W.2d 368 (Mo. 1972)]; gunshot residue tests, *State v. Smith,* [50 Ohio App. 2d 183, 362 N.E.2d 1239 (1976)]; Nalline tests for detection of narcotics use, *People v. Williams,* [164 Cal. App. 2d Supp. 858, 331 P.2d 251 (1958)]; ink identification tests, *United States v. Bruno,* [333 F.Supp. 570 (E.D. Pa. 1971)]; and hypnotism, *People v. Busch,* [56 Cal. 2d 868, 366 P.2d 314, 16 Cal. Rptr. 898 (1961)]." 283 Md. at 383.

We recognize that hypnosis is somewhat different from spectographic analysis, polygraph, and other tests mentioned in *Reed.* Nevertheless, we believe what the Supreme Court of Minnesota said in *Mack,* 292 N.W.2d 764, is relevant here:

"Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation — a filling of gaps with fantasy. Such

results are not scientifically reliable as accurate." 292 N.W.2d at 768.

We adopt the *Frye* test as the basis for evaluation of testimony where a witness has been hypnotized.

## III

Cases considering hypnosis fall into four categories: (1) those holding that hypnosis goes to the weight and credibility of the evidence, not to its admissibility; thus its evaluation is for the trier of fact; (2) those holding testimony inadmissible where a witness has been hypnotized; (3) those holding testimony of a previously hypnotized witness admissible if certain safeguards are followed; and (4) cases holding that even though a witness has been hypnotized he may testify relative to matters he disclosed prior to hypnosis. See Annot., 92 A.L.R.3d 442 (1979). All courts which have considered the matter are in agreement that testimony while under hypnosis and evidence of what a subject said while under hypnosis are inadmissible. *Pearson v. State,* 441 N.E.2d 468, 471 (Ind. 1982); *State v. Pusch,* 77 N.D. 860, 887-88, 46 N.W.2d 508 (1950); *Jones v. State,* 542 P.2d 1316, 1326-27 (Okla. Crim. 1975); *State v. Pierce,* 263 S.C. 23, 30, 207 S.E.2d 414 (1974); and *Greenfield v. Commonwealth,* 214 Va. 710, 715-16, 204 S.E.2d 414 (1974). In *People v. Busch,* 56 Cal. 2d 868, 878, 366 P.2d 314, 16 Cal. Rptr. 898 (1961), a physician was not permitted to give an opinion, derived from an examination under hypnosis, as to whether an accused was able to form an intent to kill.

Cases in the first category holding that the fact a witness has been hypnotized goes to weight and credibility and not to admissibility include: *United States v. Awkard,* 597 F.2d 667, 669 (9th Cir. 1979), *cert. denied,* 444 U.S. 885 and 444 U.S. 969 (1979); *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978); *Clark v. State,* 379 So.2d 372, 374-75 (Fla. App. 1979); *Pearson,* 441 N.E.2d at 473; *State v. Wren,* 425 So. 2d 756, 759 (La. 1983) (It should be pointed out, however, that the Louisiana court there con-

sidered significant the fact that the witness' hypnosis "caused him to give no information which he had not already given." 425 So. 2d at 759.); *State v. Temoney,* 45 Md. App. 569, 576-78, 414 A.2d 240 (1980), *rev'd on other grounds,* 290 Md. 251, 429 A.2d 1018 (1981); *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 252 Md. 731, *cert. denied,* 395 U.S. 949 (1969); *State v. Greer,* 609 S.W.2d 423, 436 (Mo.App. 1980); *State v. McQueen,* 295 N.C. 96, 119-23, 244 S.E.2d 414 (1978); *State v. Jorgensen,* 8 Or. App. 1, 9-10, 492 P.2d 312 (1971); *State v. Glebock,* 616 S.W.2d 897, 903-04 (Tenn. Crim. App. 1981); and *Chapman v. State,* 638 P.2d 1280, 1285 (Wyo. 1982).

*Harding,* 5 Md. App. 230, is described by Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313, 322 (1980), as "[t]he first reported decision concerning the use of hypnosis for enhancement of a witness' memory . . . ."[1] It was decided ten years prior to our adoption of the *Frye* rule in *Reed,* 283 Md. 374. Judge Thompson there said for the court:

> "The admissibility of Mildred Coley's testimony concerning the assault with intent to rape case causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide. *Borman v. State,* 1 Md. App. 276, 229 A.2d 440, *Carroll v. State,* 3 Md. App. 50, 237 A.2d 535, *Thompson v. State,* 4 Md. App. 31, 240 A.2d 780." 5 Md. App. at 236.

The New York Court of Appeals noted in *Hughes,* "Until 1980 the *Harding* rule has been uniformly, almost

---

1. In the light of hindsight we probably should have granted Harding's petition for a writ of certiorari. However, since it was the first case, there was at that time no contrary view elsewhere. Moreover, we had our own caseload problems at that time.

automatically, followed in other jurisdictions and still commands a majority." 59 N.Y.2d at 538, 453 N.E.2d at 491.

In *Adams,* 581 F.2d 193, the court relied upon its prior decisions in *Kline v. Ford Motor Co., Inc.,* 523 F.2d 1067, 1069 (9th Cir. 1975), and *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir. 1974), both of which arose in a civil context; upon *Jorgensen,* 8 Or. App. 1, and upon *Harding,* 5 Md. App. 230. Actually, there is little discussion in *Kline, Wyller,* or *Jorgensen* other than reliance upon *Harding.*

Cases holding that a witness who has been hypnotized may not testify are *Mena,* 128 Ariz. 226, 231-32; *Shirley,* 31 Cal. 3d 18, 66; *Gonzales,* 108 Mich. App. 145, 161; *Mack,* 292 N.W.2d 764, 771 (Minn.); and *Nazarovitch,* 496 Pa. 97, 110. *Shirley* is the most comprehensive of the opinions in this group. In it Justice Mosk reviewed for the Supreme Court of California virtually every case on the subject that had been decided up to that time including *Harding, Jorgensen,* and *Hurd,* 86 N.J. 525, plus much of the material in the field. At one point the opinion states:

> "The principal proponent of hypnotically aided recall is a police department psychologist, Martin Reiser, Ed.D. According to his published writings, Dr. Reiser operates on the belief that human memory is like a videotape machine that (1) faithfully records, as if on film, every perception experienced by the witness, (2) permanently stores such recorded perceptions in the brain at a subconscious level, and (3) accurately 'replays' them in their original form when the witness is placed under hypnosis and asked to remember them. (See, e.g., Reiser, Handbook of Investigative Hypnosis (1980), ch. 40; Reiser, *Hypnosis as a Tool in Criminal Investigation* [Nov. 1976] The Police Chief 36, 40; Reiser, *Hypnosis as an Aid in a Homicide Investigation* (1974) 17 Am.J. Clinical Hypnosis 84, 85.) With minor variations, this belief — or assumption — is apparently shared by police psy-

chologists and 'hypnotechnicians' at all levels of law enforcement, and serves as the theory on which such personnel base their practice of hypnotizing potential witnesses to improve their recall of crime-related events.

"The professional literature, however, rejects this belief: the scientists who work in the field generally agree that, as Dr. Schafer testified at trial, the memory does *not* act like a videotape recorder, but rather is subject to numerous influences that continuously alter its content. This view has been expressed at least since the pioneer study of Sir Frederic C. Bartlett of Cambridge University, published a half-century ago. (Bartlett, Remembering (1932, reprinted 1964).) Using a different simile in that pretelevision era, Bartlett critically examined the conventional belief of his time that 'traces' of every event were laid down in the mind and permanently stored until they were 're-excited' by a stimulus and reappeared as memories. Bartlett began his analysis by pointing out that 'there are obvious difficulties. The traces are generally supposed to be of individual and specific events. Hence, every normal individual must carry about with him an incalculable number of individual traces. Since these are all stored in a single organism, they are in fact found to be related one to another, and this gives to recall its inevitably associative character' (*id.* at p. 203).

"Less obvious but even more important was Bartlett's now-famous conclusion, drawn from his experimental work, that memory is productive rather than reproductive: 'The first notion to get rid of is that memory is primarily or literally reduplicative, or reproductive. . . . In fact, if we consider evidence rather than presupposition, remembering appears to be far more decisively an affair of construction rather than one of mere

reproduction.' *(Id.* at pp. 204-205.) As had often been shown, 'condensation, elaboration and invention are common features of ordinary remembering' *(id.* at p. 205). Expanding on the latter point, Bartlett reported that 'our studies have shown us that all manner of changes in detail constantly occur in instances which every normal person would admit to be genuine instances of remembering. There are changes in order of sequence, changes of direction, of complexity of structure, of significance, . . .' *(Id.* at p. 312.) In summary, 'Remembering is not the re-excitation of innumerable fixed, lifeless and fragmentary traces. It is an imaginative reconstruction, or construction, built out of the relation of our attitude towards a whole active mass of organized past reactions or experience . . . .' *(Id.* at p. 213.)

"Bartlett's insight that 'the past is being continually re-made, reconstructed in the interests of the present' *(id.* at p. 309) prevailed in due course among his colleagues, and is now the generally accepted view of the profession." 31 Cal. 3d at 57-58 (emphasis in original, footnote omitted).

The court held:

"The professional literature thus fully supports the testimony of Dr. Schafer and the similar findings of the courts in *Mack, Mena,* and *Nazarovitch.* It also demonstrates beyond any doubt that at the present time the use of hypnosis to restore the memory of a potential witness is *not* generally accepted as reliable by the relevant scientific community. Indeed, representative groups within that community are on record as expressly opposing this technique for many of the foregoing reasons, particularly when it is employed by law enforcement hypnotists. In these circumstances it is obvious that the *Frye* test of admissibil-

ity has not been satisfied. We therefore hold, in accord with the decisions discussed above (Part II C, *ante)*, that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward. It follows that the trial court erred in denying defendant's motion to exclude Catherine's testimony." *Id.* at 66-67 (emphasis in original, footnotes omitted).

The court said, however, that a previously hypnotized witness is not incompetent in the strict sense of being unable to express himself comprehensibly or understand his duty to tell the truth or of lacking the general capacity both to perceive and remember. Thus, it said, "[I]f the prosecution should wish to question such a witness on a topic *wholly unrelated* to the events that were the subject of the hypnotic session, his testimony as to that topic would not be rendered inadmissible by the present rule." *Id.* at 67 (emphasis in original).

There are four cases falling within the third category: *Hurd,* 86 N.J. 525; *Beachum,* 97 N.M. 682; *Long,* 32 Wash. App. 732; and *State v. Armstrong,* 110 Wis. 2d 555, 329 N.W.2d 386 (1983). Another case, *Brown,* 426 So. 2d 76, 91-93 (Fla. Dist. Ct. App.), adopts all of the *Hurd* "safeguards" but for the requirement that the hypnotic session be conducted by a psychiatrist or a psychologist. In *Pearson,* 441 N.E.2d at 473, although holding, as we have previously noted, that the determination of the weight of the testimony was for the jury, the Supreme Court of Indiana observed that to protect the credibility of a witness who is subjected to a hypnotic session a careful investigator should take precautions such as those enumerated in *Hurd.*

*Hurd* also is a comprehensive opinion. Early in its discussion it states, "A majority of the courts that have considered the question have held that hypnotically induced testimony is admissible," citing *Awkard,* 597 F.2d 667; *United States v. Narciso,* 446 F. Supp. 252 (E.D. Mich. 1977); *Clark,* 379

So.2d 372; *Creamer v. State,* 232 Ga. 136, 205 S.E.2d 240 (1974); *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848 (1979); *McQueen,* 295 N.C. 96; *People v. Hughes,* 99 Misc. 2d 863, 417 N.Y.S.2d 643 (1979); and *Jorgensen,* 8 Or. App. 1. It stated:

"These cases have generally reasoned that testimony of a witness whose memory has been revived through hypnosis should be treated like any other present recollection refreshed. That the witness' memory may have been impaired by hypnosis or that suggestive material may have been used to refresh his recollection is considered to be a matter affecting credibility, not admissibility. It is assumed that skillful cross-examination will enable the jury to evaluate the effect of hypnosis on the witness and the credibility of his testimony." 86 N.J. at 535.

It said that two recent cases have criticized "the assumptions underlying this attitude toward hypnotically refreshed testimony," referring to *Mena,* 128 Ariz. 226, and *Mack,* 292 N.W.2d 764 (Minn. 1980). It pointed out that hypnosis is employed as a means of overcoming amnesia and restoring the memory of a witness and then stated:

"In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate. Based on the evidence submitted at trial, we are satisfied that the use of hypnosis to refresh memory satisfies the *Frye* standard in certain instances. If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory. Consequently, hypnotically-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the partic-

ular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." 86 N.J. at 538.

It held "that testimony enhanced through hypnosis is admissible in a criminal trial if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." 86 N.J. at 543.

The New Jersey Court laid down certain requirements with which a party would be obliged to comply before he might introduce hypnotically refreshed testimony. Those requirements were gleaned from Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int. J. Clinical & Experimental Hypnosis, 311, 335-36 (1979), said by Dr. Orne to have been proposed by him as "minimal safeguards in an affidavit . . . in the case of *Quaglino v. California* (1978) which was filed with the Supreme Court of the United States." The standards laid down by the New Jersey Court are:

"First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

"Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. This condition will safeguard against any

bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

"Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

"Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

"Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

"Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. Although it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great, as this case illustrates. Likewise, the mere presence of such a person may influence the response of the subject.

"Once compliance with these safeguards is shown, the trial court can determine the reliability and therefore the admissibility of hypnotically

refreshed testimony, according to the standard set forth above." 86 N.J. at 545-46 (emphasis in original, footnote omitted).

Prior to this it stated:

"Whenever a party in a criminal trial seeks to introduce a witness who has undergone hypnosis to refresh his memory, the party must inform his opponent of his intention and provide him with the recording of the session and other pertinent material. The trial court will then rule on the admissibility of the testimony either at a pretrial hearing or at a hearing out of the jury's presence. In reviewing the admissibility of hypnotically refreshed testimony, the trial court should evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties. The object of this review is not to determine whether the proffered testimony is accurate, but instead whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory." 86 N.J. at 543 (footnote omitted).

Cases falling in the final category permitting a witness to testify with regard to those matters which he was able to recall and relate prior to hypnosis include: *United States v. Waksal,* 539 F.Supp. 834, 838 (S.D. Fla. 1982); *Collins,* 132 Ariz. 180, 209; *Quintanar,* 659 P.2d 710, 713 (Colo. Ct. App.); *Merrifield v. State,* 272 Ind. 579, 400 N.E.2d 146, 149 (1980); *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848, 855 (1979); *State v. Wren,* 425 So. 2d 756, 758 (La. 1983); *People v. Wallach,* 110 Mich. App. 37, 72-73, 312 N.W.2d 387 (1981); *State v. Koehler,* 312 N.W.2d 108, 110 (Minn. 1981) ("On remand, Thomas Houle may not testify to matters adduced at the pretrial hypnotic interview except as such matters were previously and unequivocally disclosed by him to the authorities, prior to the hypnosis."); *Beachum,* 97

N.M. 682, 643 P.2d 246, 252; *People v. Hughes,* 59 N.Y.2d 523, 545, 453 N.E.2d 484, 495 (1983) ("[S]ince there must be a new trial, we note our agreement with those courts which have concluded that the pretrial use of hypnosis does not necessarily render the witness incompetent to testify to events recalled prior to being hypnotized."); *Com. v. Taylor,* 294 Pa. Super. 171, 175, 439 A.2d 805 (1982); and *Glebock,* 616 S.W.2d 897 (Tenn.). See also *People v. Adams,* 137 Cal. App. 3d 346, 187 Cal. Rptr. 505 (1982). At issue was whether *Shirley,* 31 Cal. 3d 18, was to be applied retroactively. In finding "no fact basis [t]here compelling application of the *Shirley* principles to th[at] case," the court noted that although "[t]he victim's testimony in *Shirley* was 'vague, changeable, self-contradictory [and] prone to unexplained lapses of memory,'" the witness in *Adams* "never waivered in her identification of Adams, her statements pre-hypnosis [were] consistent with her post-hypnosis testimony." 187 Cal. Rptr. at 509.

*Collins,* 132 Ariz. 180, is interesting in part because of the turnabout done by the Supreme Court of Arizona. Earlier in *Mena,* 128 Ariz. 226, 232, that court said, "In order to ensure against the dangers of hypnosis, . . . this Court will consider testimony from witnesses who have been questioned under hypnosis regarding the subject of their offered testimony to be inadmissible in criminal trials from the time of the hypnotic session forward." By footnote the court observed that its decision might "place the state in the difficult position of choosing whether to use a particular witness' testimony at a criminal trial or to subject that witness to hypnotism as an investigatory tool." The original opinion in *Collins* came but eleven months after *Mena.* The court then followed its opinion in *Mena.* However, the State moved for a rehearing after there was a change in the court's personnel. The court then said:

> "As a practical matter, if we are to maintain the rule of incompetency, the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent if

it is later determined that the testimony of that witness is essential. Thus, applying the *Frye* test of general acceptance and weighing the benefit against the risk, we modify our previous decision and hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case. That witness will be permitted to testify with regard to those matters which he or she was able to recall *and* relate prior to hypnosis. Thus, for example, the rape victim would be free to testify to the occurrence of the crime, the lack of consent, the injury inflicted and the like, assuming that such matters were remembered and related to the authorities prior to use of hypnosis." 132 Ariz. at 209 (emphasis in original).

The court cited in support of its position *Taylor,* 294 Pa. Super. 171; *Wallach,* 110 Mich. App. 37; and *Koehler,* 312 N.W.2d 108 (Minn.). It said it recognized "that there is danger even in allowing testimony of facts recalled prior to hypnosis, because the subsequent hypnosis does have an effect upon the witness' confidence in those facts." It then stated, "It is for this reason that we originally adopted Dr. Diamond's suggestion that any witness who had been hypnotized would be incompetent to testify for any purpose. We are persuaded, however, that with respect to investigatory use of hypnosis, the benefit does outweigh the danger." *Id.* at 210. Guidelines were laid down:

"We further minimize the risk by requiring that before hypnotizing a potential witness for investigatory purposes, the party intending to offer the prehypnotic recall appropriately record in written, tape recorded or, preferably, videotaped form the substance of the witness' knowledge and recollection about the evidence in question so that the prehypnotic recall may be established. Such recordation must be preserved so that at trial the testimony of that witness can be limited to the

prehypnotic recall. If such steps are not taken, admission of the prehypnotic recall will be error, which, if prejudicial, will require reversal.

"Further, parties intending to use hypnosis for investigatory purposes should make sure that the hypnosis procedure is performed in a manner designed to minimize the danger of contamination of both prehypnotic and posthypnotic recall. A record of that procedure should be made and retained. While we do not impose any particular set of standards for that purpose, we suggest that litigants adopt some, if not all of the Orne standards referred to above. Any litigant intending to offer testimony of a witness who has been hypnotized must make timely disclosure of such information to the court and to opposing counsel." 132 Ariz. 210.

In *Smrekar,* 68 Ill. App. 3d 379, the court said:

"Defendant bases his claim of error partly upon a deprivation of his right to cross-examine the previously hypnotized witness. However, the ability to cross-examine the witnesses is one element that distinguishes the use of testimony of the previously hypnotized witness from the impermissible procedure of introducing testimony of the hypnotist as to the statements made to him by the patient while under hypnosis. While the hypnosis could affect the mind of the witness in such a subconscious way that the cross-examination could not reach, all witnesses are, to some extent, subject to subconscious stimuli similarly obscure.

"We rule that the testimony of Ann Mardis identifying the defendant as the person she saw at the scene of the crime is not rendered inadmissible by her hypnosis prior to making a positive identification of him and prior to testimony at trial where (1) the hypnotist was shown to be competent, (2) the evidence indicated that suggestion was not used in

the hypnosis, (3) the identification was corroborated by other substantial evidence unknown to the witness at the time she made positive identification of the defendant, and (4) the evidence showed that at the time of the occurrence, the witness had ample opportunity to view him. We consider this testimony to have been an aid to the trier of fact in arriving at the truth and to have been properly admitted." 68 Ill. App. 3d at 388.

In *Wallach,* 110 Mich. App. 37, the court said:

"Professor Diamond takes the position that because of the problem of a witness's developing subjective certainty of events following the hypnosis, a jury cannot properly weigh such a witness's testimonial recollections. As such, Diamond believes the hypnotized witness has become 'contaminated' and should not be allowed to testify. We recognize that there may be some problems in this regard. However, we believe that full cross-examination, in which defense counsel can question the previously hypnotized witness concerning the tentativeness of the recollections prior to the hypnosis, will largely alleviate these problems. We would also allow the defendant to introduce expert testimony detailing the inherent possibility that a hypnotized witness might become subjectively certain of events only tentatively recalled or, indeed, recalled inaccurately. At present, however, no jurisdiction has taken the position that the mere fact that a witness has been hypnotized precludes *all* testimony from that witness. We decline to do so in this case." 110 Mich. App. at 73 (emphasis in original).

In the just decided case of *Hughes* the New York Court of Appeals observed:

"Contrary to the prosecutor's contention, hypnosis is not comparable to the other methods of refreshing recollection long accepted at common

law. Indeed if the prosecutor's point were well taken there would be no need, when the other means were available, to employ hypnosis. One of the legally endorsed techniques for reviving a witness's recollection would do just as well. What distinguished hypnosis is the fact that suggestion is an essential and inseparable part of the process which alters a witness's consciousness and makes him more prone to suggestion and to recall events inaccurately than he would in a normal state of consciousness. In fact, it is a scientific process and the recollections it generates must be considered as scientific results (see, e.g. *Polk v. State,* 48 Md. App. 382, 427 A.2d 1041, 1048 [(1981)]). Certainly a layman could not assess those results without expert guidance and might be unduly impressed by the witness's enhanced recollections if he mistakenly viewed them as the result of normal recall." 59 N.Y.2d at 542, 453 N.E.2d at 494 (footnotes omitted).

The most eminent physicians who have written and testified on the subject of hypnosis appear to be Drs. Bernard L. Diamond and Martin T. Orne. Dr. Diamond wrote *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313 (1980). He "believe[s] that once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify." *Id.* at 314. He is of the view:

"Hypnosis may have some value as an investigatory instrument when used to enhance memory. However, the law should recognize that the use of hypnosis for such a purpose renders the potential witness incompetent, literally destroying the probative value of any evidence that the witness might otherwise have been able to produce." *Id.* at 332 (footnotes omitted).

He asks a number of rhetorical questions. His answers are to the effect that a hypnotized person cannot be free from heightened suggestibility; that a hypnotist through the exercise of skill and attention cannot avoid implanting suggestions in the mind of the hypnotized subject; that after awakening the hypnotic subject cannot consistently recognize which of his thoughts, feelings, and memories were his own and which were implanted by the hypnotic experience; that it is not rare for a person to believe that he was not hypnotized when in fact he was; that previously hypnotized persons cannot restrict their memory to actual facts, free from fantasies and confabulation; that hypnotism can induce subtle but highly significant distortions of memory that will persist indefinitely, distorting all subsequently related recall of the subject; that even the best experts cannot consistently distinguish between actual and pretended hypnosis; that neither the hypnotist nor the subject can sort out facts from fantasy in the recall during or after hypnotism; that the specificity and richness of recalled memories is not an assurance that the hypnotic or posthypnotic subject is recalling fact; that the independent corroboration of some of the hypnotically enhanced memories does not assure that all or most of the witness' memories are reliable; that a complete record of the hypnotic experience is never possible; that "a witness who quite honestly reveals that he is unsure of the identification of a defendant from a photograph or a line-up, may, after hypnosis, become quite certain and confident that he has picked the right man"; that an experienced hypnotist or other expert cannot have a reliable and valid opinion that the recall of a particular witness whose memory has been enhanced by hypnotism was reliable and valid; and that the uncertainties of ordinary eyewitness testimony and those of hypnotically enhanced recall are not sufficiently similar that the legal rules of procedures designed for coping with the one are sufficient for the other.

Dr. Diamond states:

> "Pretrial hypnosis of a witness cannot be considered a harmless form of 'coaching' or legitimate preparation of the witness for the courtroom experience. In some respects it is worse than ordinary subornation of a witness for it accomplishes the same effect, yet allows the perpetrator, the witness, and the trier of fact to remain unaware that perversion of the evidence has occurred." *Id.* at 342.

He concludes:

> "Many courts currently admit testimony from previously hypnotized witnesses without an adequate understanding of the nature of hypnosis and its dangers to truly independent recall. Perhaps influenced by often naive legal scholarship and biased expert testimony, these courts apparently believe that cross-examination and expert witness attacks on the credibility of such testimony will reveal any shortcomings in the hypnosis and get to the truth. This hope is misplaced. Even if the hypnotist takes consummate care, the subject may still incorporate into his recollections some fantasies or cues from the hypnotist's manner, or he may be rendered more susceptible to suggestions made before or after the hypnosis. A witness cannot identify his true memories after hypnosis. Nor can any expert separate them out. Worse, previously hypnotized witnesses often develop a certitude about their memories that ordinary witnesses seldom exhibit. Further harm is caused by 'expert' witnesses (often self-styled and police-oriented) who, testifying in the state's behalf, make extravagant, scientifically unjustified claims about the reliability of hypnotically enhanced testimony. The plain fact is that such testimony is not and cannot be reliable. The only sensible approach is to exclude testimony from previously hypnotized wit-

nesses as a matter of law, on the ground that the witness has been rendered incompetent to testify." *Id.* at 348-49.

Dr. Orne is the author, among many other papers, of *The Use and Misuse of Hypnosis in Court,* XXVII, No. 4, Int. J. Clinical & Experimental Hypnosis 311 (1979). He states, "[I]t is possible for even deeply hypnotized subjects to willfully lie." *Id.* at 313. He suggests that suddenly recalled information might be rejected by a jury as self-serving and not trustworthy, but that memories which are recalled via the use of hypnosis are more apt to be taken at face value. *Id.* at 315. He states:

"The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotically aided recall are historically accurate and which aspects have been confabulated. The details of material that is confabulated depend upon the subject's total past experience and all available cues relevant to the hypnotic task. Subjects will use prior information and cues in an inconsistent and unpredictable fashion; in some instances such information is incorporated in what is confabulated, while in others the hypnotic recall may be virtually unaffected." *Id.* at 317-18.

At another point Dr. Orne says:

"The idea that one can in hypnosis somehow reactivate original memory traces stems from a widely held view (especially among lay hypnotists) that memory involves a process analogous to a

multi-channel videotape-recorder inside the head which records all sensory impressions and stores them in their pristine form. Further, there is a belief that while this material cannot ordinarily be brought to consciousness, it can be accessed through hypnosis; this mechanism is presumed to make possible the phenomenon of age regression or revivification. Suffice it to say that such a view is counter to any currently accepted theory of memory and is not supported by scientific data (for reviews, see for example, Hilgard & Loftus, 1979; Jenkins, 1974; Putnam, 1979; Roediger, 1979). As Bartlett (1932) pointed out many years ago, memory is continuously changing and is *reconstructive* as well as reproductive. It is possible that highly traumatic, emotional material that is repressed could be less subject to the kind of continuing changes seen with relatively neutral material, but even this is doubtful since, as has been pointed out earlier, many of the memories recovered in psychotherapy include material which is not historically accurate." *Id.* at 321 (emphasis in original).

Dr. Orne said, "The use of hypnosis in an investigative context, with the sole purpose being to obtain leads, is clearly the area where hypnotic techniques are most appropriately employed." *Id.* at 327. He states flatfootedly, however, "A 'memory' can be created in hypnosis where none existed before." *Id.* at 328.

In the same issue of Int. J. Clinical & Experimental Hypnosis as Dr. Orne's paper, at 452 and 453, are printed resolutions adopted by the Society for Clinical and Experimental Hypnosis, October 1978, and the International Society of Hypnosis, August 1979, each of which in identical language "views with alarm the tendency for police officers with minimal training in hypnosis and without a broad professional background in the healing arts employing hypnosis to presumably facilitate recall of witnesses or victims privy to the occurrence of some crime." They state, "It must be empha-

sized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification." The resolutions refer to the fact that police officers have had limited technical training; that their orientation is to obtain the information needed to solve a crime rather than a concern focusing on protecting the health of the subject who was either witness to, or victim of, a crime; that "police officers understandably have strong views as to who is likely to be guilty of a crime and may easily inadvertently bias the hypnotized subject's memories even without themselves being aware of their actions," and that for these and related reasons the societies are "strongly opposed to the training of police officers as hypnotechnicians and the use of hypnosis by the police officer." They state, "In those instances when hypnosis is appropriately used in law enforcement, trained psychiatrists or psychologists with experience in the forensic use of hypnosis should be employed, care must be taken to control the amount of information wittingly and unwittingly provided to the subject, and all interactions with the subject before, during, and after hypnosis must be videotaped." Each society views it as unethical to train lay individuals in the use of hypnosis, to collaborate with laymen in the use of hypnosis, or to serve as a consultant for laymen who are utilizing hypnosis.

In *Collins,* 52 Md. App. 186, Judge Liss referred for the court to literature in the field including that by Diamond, and many of the cases to which we have referred.[2]

## IV

We decline to follow the procedures outlined in *Hurd,* 86 N.J. 525, for the admission of hypnotically enhanced testimony for the reasons explained by Justice Mosk in *Shirley,* 31 Cal. 3d 18:

---

**2.** Other material which we have examined includes Dilloff, *The Admissibility of Hypnotically Influenced Testimony,* 4 Ohio N.Y.L. Rev. 1 (1977); Note: *Testimony by Previously Hypnotized Witnesses: Should It Be Admissible?* 18 Idaho L. Rev. 111 (1982); and Note: *Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony,* 38 Wash. & Lee L. Rev. 197 (1981).

"[E]ven if requirements could be devised that were adequate in theory, we have grave doubts that they could be administered in practice without injecting undue delay and confusion into the judicial process. To be sure, it would usually be easy to determine if the hypnotist was an appropriately trained psychiatrist or psychologist. It might be harder to establish that he was sufficiently independent of the prosecution or defense to avoid subconscious bias. And it would certainly be far more difficult to prove strict compliance — which *Hurd* demands — with each of the remaining 'safeguards.' It strains credulity, for example, to believe that a conscientious defense counsel would meekly agree that the prosecution had recorded every bit of relevant information conveyed to the hypnotist prior to the session, or that the hypnotist had conveyed absolutely none of that information to the subject either while extracting the latter's prehypnotic version of the facts or while questioning him both during and after hypnosis, or that *every single contact* between the hypnotist and the subject, no matter how innocuous, had been preserved on videotape.

"On the other hand, it takes little prescience to foresee that these and related issues would provide a fertile new field for litigation. There would first be elaborate demands for discovery, parades of expert witnesses, and special pretrial hearings, all with concomitant delays and expense. Among the questions our trial courts would then be expected to answer are scientific issues so subtle as to confound the experts. (See, e.g., fn. 24, *ante.)* Their resolution would in turn generate a panoply of new claims that could be raised on appeal, including difficult questions of compliance with the 'clear and convincing' standard of proof. And because the hypnotized subject would frequently be the victim, the eyewitness, or a similar source of crucial testimony against the

defendant, any errors in ruling on the admissibility of such testimony could easily jeopardize otherwise unimpeachable judgments of conviction. In our opinion, the game is not worth the candle." 31 Cal. 3d at 39-40 (footnote omitted).

In n. 24 at 39, to which reference is made above, the court said:

"[O]ne of the requirements set forth in *Hurd* is that all contacts between the hypnotist and the subject must be recorded, for the stated purpose of enabling the trial court to determine what 'cues' the hypnotist may have conveyed to the subject by word or deed; and the opinion strongly encouraged the use of videotape to make such recordings. (432 A.2d at p. 97.) Yet as the same opinion recognizes elsewhere (at p. 93), 'Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues.' If even an expert cannot confidently make that identification, it is vain to believe that a layman such as a trial judge can do so." 31 Cal. 3d at 39.

## V

We are not satisifed that hypnotically enhanced testimony meets the *Frye-Reed* test. This does not mean that it is impermissible to use hypnosis for investigative purposes. We see no reason why a person should not be permitted to testify in court in accord with statements which it clearly can be demonstrated he made prior to hypnosis. Such is not then hypnotically enhanced testimony. This seems to be in accord with the majority view. We do not go so far as to spell out the exact procedures which must be followed to clearly demonstrate that such statements were made prior to hypnosis. One method certainly might be to follow the guidelines laid down by the Arizona court in *Collins,* 132 Ariz. 180, 210, which we have heretofore quoted. Since one cannot

possibly envision all possible situations in which statements prior to hypnosis might be demonstrated to accord with posthypnotic testimony, we deem it wise not to attempt to spell out each and every condition or possibility for demonstrating reliability. To do otherwise is to risk omission of acceptable solutions which do not occur to us. The transcript at the first trial provides reliable demonstration of Davis' prehypnotic observations here. Ordinarily, it would be admissible for that purpose. However, in this case Davis' prehypnotic observations are tainted by virtue of their inconsistency with his posthypnotic testimony. It follows, therefore, that the Court of Special Appeals correctly concluded that the presence of this hypnotically enhanced testimony requires a new trial.

## VI

We have carefully considered the points presented by Collins relative to his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694 (1966), and *Johnson v. State*, 282 Md. 314, 384 A.2d 709 (1978). We have examined each of the cases cited by him in support of his contentions. We find no error in the opinion of the Court of Special Appeals as to those points.

> *Judgment affirmed; costs to be paid by the County Commissioners of Worcester County.*

*Murphy, C. J., concurring and dissenting:*

The Court today holds that a witness cannot testify about matters which have been the subject of questioning under hypnosis, absent a "clear demonstration" that the witness independently recalled and related the substance of the proffered testimony prior to being subjected to questioning under hypnosis. From this holding, I must respectfully dissent.

## I

Hypnosis has had several cycles of professional interest and rejection, but currently is widely used as a tool in criminal investigations to aid witnesses in recalling details of events which have been forgotten or imperfectly remembered.[1] *See People v. Hughes,* 99 Misc.2d 863, 417 N.Y.S.2d 643 (1979). As an aid to obtaining investigatory leads, hypnosis has received all but unanimous support. *See, e.g., State v. Mack,* 292 N.W.2d 764, 771 (Minn. 1980):

> "We do not foreclose, by this opinion, the use of hypnosis as an extremely useful investigative tool when a witness is enabled to remember verifiable factual information which provides new leads to the solution of a crime."

*But cf. People v. Shirley,* 31 Cal.3d 18, 68 n. 55, 181 Cal. Rptr. 243, 273 n. 55, 641 P.2d 775, 805 n. 55, *cert. denied,* 103 S. Ct. 133 (1982). Considerably more disagreement has arisen, however, when the testimonial fruits of hypnosis have sought to be admitted in evidence in court.

Hypnosis-related evidence has taken many forms. Perhaps the most direct is the testimony of a witness given while hypnotized in the courtroom. Uniformly, courts have rejected the practice. *See, e.g., Greenfield v. Commonwealth,* 214 Va. 710, 716, 204 S.E.2d 414, 419 (1974). Nor have they been receptive to alternatives to such in-court hypnotic testimony, such as transcripts, audio or video tapes of out-of-court hypnotic sessions, *e.g., People v. Blair,* 25 Cal.3d 640, 664-66, 159 Cal. Rptr. 818, 833-34, 602 P.2d 738, 753-54 (1979); *People v. Modesto,* 59 Cal.2d 722, 732-33, 31 Cal. Rptr. 225, 231-32, 382 P.2d 33, 39 (1963); *People v. Hangsleben,* 86 Mich. App. 718, 727-31, 273 N.W.2d 539, 543-44 (1978); *State v. Harris,* 241 Or. 224, 236-37, 405 P.2d

---

1. Elements of hypnotic technique have been used since antiquity, although Franz Anton Mesmer (1734-1815), an Austrian physician, is generally credited with the "discovery" of hypnosis in Europe, modestly giving it the name "mesmerism." The term "hypnosis" was coined in 1840 by a Scottish physician, James Baird.

492, 497-500 (1965); or testimony by the hypnotist as to what was said during the sessions, *e.g., Greenfield v. Robinson,* 413 F. Supp. 1113, 1120-21 (W.D. Va. 1976); *People v. Kester,* 78 Ill. App. 3d 902, 909-10, 397 N.E.2d 888, 893-94 (1979); *State v. Conley,* 6 Kan. App. 2d 280, 283-286, 627 P.2d 1174, 1177-78 (1981); *People v. Hangsleben,* 86 Mich. App. at 727-31, 273 N.W.2d at 543-44; *Jones v. State,* 542 P.2d 1316, 1326-28 (Okla. Crim. App. 1975); *State v. Harris,* 241 Or. at 236-37, 405 P.2d at 497-500; *Greenfield v. Commonwealth,* 214 Va. at 715-16, 204 S.E.2d at 418-19. Some courts have admitted such evidence as the basis for an expert's opinion, *e.g., People v. Modesto,* 59 Cal.2d at 732-33, 31 Cal. Rptr. at 231-32, 382 P.2d at 39-40; *but see People v. Diaz,*      Colo. App.    , 644 P.2d 71, 73 (1981):

> "On retrial, the psychiatrist should not be permitted to testify as to the mental state of the defendant if his opinion is based on information gained through hypnosis."

An expert's proffered testimony as to the truth or falsity of the witness's hypnotized statements generally has been excluded, *e.g., Jones v. State, supra,* 542 P.2d at 1326-28.

The area of greatest confusion and controversy has centered on the admissibility of in-court testimony by previously-hypnotized witnesses, and the corollary problem of admissibility of expert testimony about the techniques of hypnosis, before or after the witness has testified. In general, expert testimony designed to bolster the credibility of a previously-hypnotized witness has not been admitted, *see, e.g., United States v. Awkard,* 597 F.2d 667, 669-71 (9th Cir.), *cert. denied,* 444 U.S. 885 (1979); *People v. Hangsleben,* 86 Mich. App. at 728-31, 273 N.W.2d at 544-45, unless the credibility of the witness has first been attacked. Even then, some courts have required a preliminary showing that hypnosis is an effective technique before testimony is admitted to bolster credibility, *People v. Hangsleben,* 86 Mich. App. at 730-31, 273 N.W.2d at 545. Where the witness's testimony has been admitted, expert

testimony attacking hypnosis or the witness's credibility has been allowed. *Collier v. State,* 244 Ga. 553, 556-59, 261 S.E.2d 364, 370-71 (1979), *cert. denied,* 445 U.S. 946 (1980); *People v. Lucas,* 107 Misc.2d 231, 238, 435 N.Y.S.2d 461, 466 (1980).

The widest divergence of judicial opinion is on the admissibility of in-court testimony of a witness who has been hypnotized in out-of-court sessions. One line of decisions was initiated by a Maryland Court of Special Appeals case, *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 395 U.S. 949 (1969). In *Harding,* the defendant was charged with assault with intent to rape. The victim was found in a state of shock, lying on the roadside, with a gunshot wound in the chest and evidence of recent sexual intercourse. Her statements recounting the events which resulted in her injury were inconsistent, and she was at first unable to recall certain parts of what happened. After being released from the hospital, the victim was hypnotized by a psychiatrist and was able to recall the events occurring after she had been shot. At trial, both the victim and the psychologist testified over the defendant's objection. The victim recounted her recollection of events, as well as her recollections of the hypnotic session. The psychologist testified on the techniques of hypnotism, the events of the victim's hypnosis session, and also expressed an opinion as to the reliability of the results of the session. The *Harding* court found:

> "The admissibility of [the victim's] testimony concerning the assault with intent to rape case causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide." *Id.* at 236, 246 A.2d at 306.

The *Harding* rationale — that the effect of out-of-court hypnosis on in-court testimony goes to the weight of the evidence rather than admissibility — has been adopted by a substantial number of jurisdictions. *See, e.g., United States v. Awkard,* 597 F.2d at 669; *United States v. Waksal,* 539 F. Supp. 834, 838 (S.D. Fla. 1982); *United States v. Narciso,* 446 F. Supp. 252, 282-84 (E.D. Mich. 1977); *Clark v. State,* 379 So.2d 372, 375 (Fla. Dist. Ct. App. 1979); *People v. Smrekar,* 68 Ill. App. 3d 379, 385-88, 385 N.E.2d 848, 852-55 (1959); *State v. Greer,* 609 S.W.2d 423, 436 (Mo. App. 1980), *vacated on other grounds,* 450 U.S. 1027 (1981); *State v. McQueen,* 295 N.C. 96, 119-22, 244 S.E.2d 414, 427-29 (1978); *State v. Jorgensen,* 8 Or. App. 1, 7-9, 492 P.2d 312, 315 (1971); *State v. Glebock,* 616 S.W.2d 897, 903-04 (Tenn. Crim. App. 1981); *Chapman v. State,* 638 P.2d 1280, 1282-85 (Wyo. 1982). Some jurisdictions, while not finding testimony of witnesses who have been previously hypnotized *per se* inadmissible, have established strict guidelines which must be followed in the hypnosis sessions before the witnesses are allowed to testify. *E.g., State v. Hurd,* 86 N.J. 525, 545-46, 432 A.2d 86, 96-97 (1981); *State v. Beachum,* 97 N.M. 682, 689, 643 P.2d 246, 253 (1981); *People v. McDowell,* 103 Misc.2d 832-35, 427 N.Y.S.2d 181, 182-83 (1980); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (1983). *Cf. United States v. Adams,* 581 F.2d 193, 199 n. 12 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978). Other courts, after considering the reliability of hypnosis evidence under the general acceptance test propounded in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), or its equivalent, have concluded that testimony from a witness who has been hypnotized and questioned prior to trial is *per se* inadmissible at least as to newly recalled memory. *State v. LaMountain,* 125 Ariz. 547, 551, 611 P.2d 551, 555 (1980); *People v. Shirley, supra; People v. Gonzales,* 108 Mich. App. 145, 159-60, 310 N.W.2d 306, 314 (1981), *aff'd,* 415 Mich. 615, 329 N.W.2d 743 (1982); *State v. Mack, supra,* 292 N.W.2d at 771; *State v. Palmer,* 210 Neb. 206, 218, 313 N.W.2d 648, 655 (1981); *People v. Hughes,* 59 N.Y.2d 523, 453 N.E.2d 484 (1983). Some courts have left open the question of the application of

the *Frye* standard to hypnosis. *See Commonwealth v. Nazarovitch,* 496 Pa. 97, 111, 436 A.2d 170, 178 (1981); *Commonwealth v. Juvenile,* 381 Mass. 727, 730-35, 412 N.E.2d 339, 342-44 (1980).

## II

The majority concludes that the *Frye-Reed* test must be applied in determining the admissibility of hypnotically-enhanced testimony. Maryland has, of course, adopted this test for the admissibility of mechanical or scientific test results, and expert testimony based thereon. In *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), the issue before the court was the admissibility of voice identification testimony based on analysis of spectrograms, known popularly as "voiceprints." To resolve the question of the reliability of such a "scientific" method, we applied the test first articulated in *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923):

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In *Reed,* the Court did not find voiceprints to have gained "general acceptance in the particular field." 283 Md. at 399, 391 A.2d at 377. In discussing the *Frye* standard in *Reed,* the Court quoted with approval from *People v. Kelly,* 17 Cal.3d 24, 31-32, 130 Cal. Rptr. 144, 149, 549 P.2d 1240, 1245 (1976):

" '. . . *Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles. . . . Several reasons founded in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to "scientific" evidence when presented by "experts" with impressive credentials. We have acknowledged the existence of a ". . . misleading aura of certainty which often envelopes a new scientific process obscuring its currently experimental nature." *(Huntingdon v. Crowley, supra,* 64 Cal.2d at p. 656, 51 Cal.Rptr. at p. 262, 414 P.2d at p. 390;. . . .) As stated in *Addison, supra,* in the course of rejecting the admissibility of voiceprint testimony, "scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury . . . ." *(United States v. Addison, supra,* 498 F.2d at p. 744.)' "

Thus, the "judicial caution" of *Frye* and *Reed* is counselled by twin dangers: that unreliable experimental evidence may be given undue weight by the jury because of the "scientific" process which generated it; and that "expert testimony" based on such evidence may be given undue weight for similar reasons.

The majority recognizes that, "[s]trictly speaking the evidence here is not of the type with which *Frye* is normally concerned," and that "hypnosis is somewhat different from [other scientific tests] mentioned in *Reed.*" In spite of the evident need for caution in extending a rule by analogy into an area with substantial differences, the majority mechanically applies the *Frye-Reed* test to hypnosis, drawing support from *State v. Mack,* 292 N.W. 2d at 768:

"Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view

that the results are scientifically reliable as accurate. Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that *no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation* — a filling of gaps with fantasy. Such results are not scientifically reliable *as accurate.* (Emphasis supplied.)

The emphasized portions of the *Mack* case highlight the analytical error made by the majority and by those cases which follow the rule adopted by the Court today. The "result" of hypnosis is not an assertion that the testimony is necessarily true or accurate. Although some proponents of hypnosis have suggested that memory retrieved by hypnosis is similar in accuracy to a videotape replay, no such claim has been made in this case and such a position is not generally accepted. Rather, the "result" of hypnosis is the ability to produce recall where there was little or none before. In this connection, there is little, if any, dispute that hypnosis is reliable in producing more recall. *See, e.g.,* Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va. L. Rev. 1203, 1208-14 (1981). Instead, those who oppose hypnosis in the courtroom focus attention on the accuracy of the recall. In effect, they (and the majority here) would seemingly require that hypnosis prove, as a matter of general acceptance, that all testimony based on memory recalled under hypnosis is historically accurate. Such a standard is virtually impossible to meet and, if applied to other evidence, would bar virtually all testimony and most other forms of evidence. Such a standard flies in the face of the truth-seeking process, by which the fact-finder is allowed to sift through the widest possible range of evidence, some of which, inevitably, is inaccurate, in order to best determine what actually occurred. Only where the scientific process itself purports to answer ultimate questions of truthfulness

and credibility of evidence should the *Frye-Reed* test impose such a difficult standard. In the case of hypnosis, the claim is only that the recall produced is at least as accurate as other testimony.

Those who oppose hypnotically-adduced testimony advance two primary reasons: first, that the "recall" is partially or totally "confabulated," with fantasy elements unconsciously added to fill gaps in historically accurate recall, or modified to conform to the hypnotist's expectations; and second, that the resulting blend of fact and fiction is "hardened" by the hypnotic process into an unshakable conviction by the witness that what he "recalls" is true. The point is most forcefully advanced by Dr. Diamond, quoted extensively by the majority, to the effect that

> "once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence." Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Cal. L. Rev. 313, 314 (1980).

Although Dr. Diamond has convinced one court, *see People v. Shirley, supra,* his view has not fared as well elsewhere. *See,* for example, *United States v. Waksal, supra,* 539 F. Supp. at 838, where the court noted:

> "The defendant presented Dr. Diamond, a psychiatrist on the faculty of the University of California, who has additional impressive credentials; his tes-

timony was most interesting but basically his ultimate conclusion is that once a witness is hypnotized, the value of a witness' testimony is completely vitiated and the witness is thereafter incompetent because hypnosis tends to freeze the memory. Dr. Diamond admits that his 'position is the extreme'.

"Several Federal courts have considered the admissibility of hypnosis testimony and Dr. Diamond's extreme position has been rejected. *United States v. Awkard,* 597 F.2d 667 (9th Cir. 1979); *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978); *Kline v. Ford Motor Co.,* 523 F.2d 1067 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506 (9th Cir. 1974); and *United States v. Narciso,* 446 F. Supp. 252 (E.D. Mich. 1977)."

Considered as a matter of competency, the Diamond view must overcome the general rule that all persons are competent to testify in criminal matters except those who are expressly excluded, either by statute or some rule of law. 97 C.J.S. *Witnesses* § 49 (1957). I do not find Dr. Diamond's self-professed "extreme" view to be either generally accepted in his field or persuasive on the merits. Absent a showing that a witness in fact has no personal recollection of the events to which he or she is testifying, or has been subject to hypnotic suggestion or manipulation, the mere fact that a witness has been hypnotized prior to trial should not render him *per se* incompetent to testify. This determination should be within the sound discretion of the trial judge.

All the alleged distortions in posthypnotic recall can be produced by non-hypnotic means. In fact, most of the asserted distortions are a normal component of the reconstructive nature of all memory recall. As the court observed in *State v. Hurd, supra,* 432 A.2d at 95:

"Research has shown that 'witnesses — particularly victims — often become more confident of the correctness of their identification as time

progresses,' in spite of the natural tendency of memory to decay. . . . This false confidence in the details of one's memory, especially when it satisfies a personal need to know and is reinforced through repeated interrogation, imparts an impression of credibility to the jury that is difficult for an adversary to undermine through cross-examination. In addition, because the witness himself generally is unaware of the changes in his memory over time . . ., his reputation for honesty and innate critical judgment cannot be counted on to reveal any inaccuracy." (Citations omitted.)

The majority acknowledges the point, quoting *People v. Shirley,* 31 Cal.3d at 58, 181 Cal. Rptr. at 267, 641 P.2d at 798-99, for the proposition that "condensation, elaboration and invention are common features of ordinary remembering" and that "the past is being continually remade, reconstructed in the interests of the present."

In my view, the proper course through the *Frye-Reed* test was chartered by the Supreme Court of New Jersey in *Hurd:*

"Unlike the courts in *[State v. Mena,* 128 Ariz. 244, 624 P.2d 1292 (1980)]* and *Mack, supra,* the court below did not demand, as a precondition of admissibility, that hypnosis be generally accepted as a means of reviving truthful or historically accurate recall. We think this was correct. The purpose of using hypnosis is not to obtain truth, as a polygraph or 'truth serum' is supposed to do. Instead, hypnosis is employed as a means of overcoming amnesia and restoring the memory of a witness. *See* Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* 38 Ohio St.L.J. 567, 584 (1977) . . . . In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically

inaccurate. Based on the evidence submitted at trial, we are satisfied that the use of hypnosis to refresh memory satisfies the *Frye* standard in certain instances. If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory. Consequently, hypnotically-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." 432 A.2d at 92.

As *Harding* indicates, the testimony of a previously hypnotized witness may be attacked on its credibility. Prior inconsistent statements, including any earlier failure to identify a suspect, as here, may be introduced for impeachment purposes. The alleged distorting and hardening effects of hypnosis may be introduced in evidence and, if attacked, the credibility of the witness may be rehabilitated by opposing testimony. If, as the majority indicates, the extra burden created by the attempted introduction of hypnosis enhanced testimony is truly "not worth the candle," such testimony will no doubt be used sparingly. The majority's rule would totally ban all such testimony rather than allowing the parties involved to decide the relative burdens and benefits in using or challenging such testimony.

### III

After deciding in Part II of the opinion that the *Frye-Reed* test applies to hypnosis, and canvassing relevant scientific and judicial opinions on the subject in Part III, the majority declares the law of Maryland in Parts IV and V of the opinion. After rejecting on "practical" grounds the procedures outlined in *State v. Hurd, supra,* the majority states that it is "not satisfied that hypnotically enhanced testimony meets the *Frye-Reed* test." However, the majority finds "no reason

why a person should not be permitted to testify in court in accord with statements which it can clearly be demonstrated he made prior to hypnosis," since "[s]uch is not then hypnotically enhanced testimony." This conclusion flies in the face of the position advanced by Dr. Diamond, which appears to provide the principal undergirding for the rule which the Court adopts today. The confusion is compounded by the majority's refusal to "spell out the exact procedures which must be followed to clearly demonstrate that such statements were made prior to hypnosis." Although it indicated that one method might be the guidelines identified in *State ex rel. Collins v. Superior Court, etc.,* 132 Ariz. 180, 644 P.2d 1266 (1982), the majority apparently decides that there has been no such demonstration in this case.

The rule the majority adopts today will most certainly call forth some prescient guessing as to what the Court will accept in the future as a "clear demonstration." Some guidance from the Court on this critical point is, I believe, essential. Not only does the Court fail to provide workable guidelines on how to preserve pre-hypnotic recollections, it compounds the confusion by failing to indicate how such evidence may be used at trial. Here, the transcript of the first trial containing the pre-hypnotic testimony of the witness would presumably meet the test of clearly demonstrating the witness' pre-hypnotic recall, and the Court concedes that "[o]rdinarily, it would be admissible for that purpose." Inexplicably, the Court finds the witness' "prehypnotic observations ... tainted by virtue of their inconsistency with his posthypnotic testimony." How subsequent testimony can "taint" earlier recorded testimony, and whether such "tainted" testimony will be admissible in the new trial is not specified.

IV

The majority today restricts the scope of evidence which fact-finders may consider in their deliberations. I share the concern expressed by Gardner, J., concurring in *People v. Williams,* 132 Cal. App. 3d 920, 927-28, 183 Cal. Rptr. 498, 501-502 (1982):

"I am troubled by the concept that the testimony of a percipient witness as to relevant facts be deemed inadmissible simply because he has undergone hypnosis.

"What next? Once we begin to rule evidence inadmissible because of our dissatisfaction with the witness' credibility based on improper memory jogging, where do we stop? What about witnesses who have been brainwashed, coached, coerced, bribed or intimidated? Are we going to reject all this testimony because it is suspect? ... Once having undergone exposure to something of this nature is the witness still going to be allowed to give his best recollection, or be precluded from testifying?

"I am firmly of the belief that jurors are quite capable of seeing through flaky testimony and pseudoscientific claptrap. I quite agree that we should not waste our valuable court time watching witch doctors, voodoo practitioners or *brujas* go through the entrails of dead chickens in a fruitless search for the truth. ... However, the idea that an eyeball witness to a transaction be denied the opportunity to tell a jury his recollections of what he saw is disturbing to me whether that recollection has been refreshed by hypnosis, truth serum, drugs, intimidation, coercion, coaching, brainwashing or impaired by the plain old passage of time."

In my view, the concerns expressed about the quality of testimony refreshed by hypnosis and the need for protective standards could best be expressed by evidentiary rule, perhaps by imposing guidelines such as those advanced in *Hurd.* Absent such limits, however, I find nothing in the *Frye-Reed* standard which compels the majority's truncation of admissible evidence available to the fact-finder. I would adhere to the reasoning in *Harding* and its progeny and allow the fact-finder to weigh the credibility of hyp-

notically-enhanced testimony in light of the circumstances in each case.

I am in full agreement with Part VI of the Court's opinion and, accordingly, I would affirm the judgment in this case.